NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| IN RE: <br> MT. OLIVE HOSPITALITY, LLC <br><br> Debtor. | Civil No. <br> 13-3395 (RBK) |
| VWI PROPERTIES, LLC, <br><br> Creditor/Appellant, <br><br> v. <br><br> MT. OLIVE HOSPITALITY, LLC, <br><br> Debtor/Appellee. | ON APPEAL FROM AN ORDER OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEW JERSEY <br><br> **OPINION** |

**KUGLER**, United States District Judge:

This matter comes before the Court on the appeal of VWI Properties, LLC (the "Creditor" or "VWI"). The Creditor appeals the Bankruptcy Court's Order authorizing Mt. Olive Hospitality, LLC (the "Debtor" or "Mt. Olive"), to use the cash collateral of the Creditor to fund renovations to the Debtor's hotel based on its finding that the Creditor was adequately protected. Because this Court finds that the Bankruptcy Court's findings were not clearly erroneous, the Order of the Bankruptcy Court will be **AFFIRMED**.

1

I.  **BACKGROUND AND PROCEDURAL HISTORY**

Debtor owns a hotel in Budd Lake, New Jersey, which it operates as a Holiday Inn franchise. (App. Br. 4, Civ. No. 13-3395, Doc. No. 5.[1]) On September 17, 2012, the Debtor filed a bankruptcy petition seeking to reorganize under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Petition Date"). VWI is the successor in interest to Roma Bank, the Debtor's original lender, and the senior secured creditor of Mt. Olive.[2]

Prior to the Petition Date, the VWI obtained a judgment in mortgage foreclosure against the Debtor in an amount exceeding $7 million. (*Id.*) A receiver was appointed for the Debtor's property in conjunction with the foreclosure proceeding, which then operated the hotel pursuant to a temporary franchise agreement with the Holiday Inn franchisor. That receiver remained in possession of the hotel until after the Petition Date when the Debtor was authorized by the Bankruptcy Court to resume possession of its property. (*Id.* at 4-5.) The Debtor is presently operating as Debtor-in-Possession in accordance with sections 1107 and 1108 of the Bankruptcy Code.[3] (No. 13-3395, Doc. No. 5, Ex. A (Second Interim Order ¶ B, Doc. No. 118).)

---

[1] As there are two relevant dockets in this matter, the Court will include the civil action number when discussing its own docket. All citations to "Doc. No." without any further description will be to the docket in the underlying bankruptcy matter.

[2] In 2011, Roma Bank transferred, for consideration, its right, and interest in the loan and its collateral to VWI. (Debtor's Mot. ¶ 2, Doc. No. 65.)

[3] 11 U.S.C. § 1107 provides:

> (a) Subject to any limitations on a trustee serving in a case under this chapter, and to such limitations or conditions as the court prescribes, a debtor in possession shall have all the rights, other than the right to compensation under section 330 of this title, and powers, and shall perform all the functions and duties, except the duties specified in sections 1106 (a)(2), (3), and (4) of this title, of a trustee serving in a case under this chapter.

At the commencement of the Bankruptcy Proceeding, the Creditor made a prima facie showing that it had properly perfected liens on the Debtor's property, "including the Debtor's inventory, equipment, receivables, rents and profits of property and the fees, charges, accounts or other payments for the use and occupancy of such rooms and other public facilities of the Debtor . . . and other collateral which is or may result in cash collateral."  (*Id.* ¶ C.)

After resuming possession of the hotel, the Debtor negotiated a franchise agreement (the "Franchise Agreement"), between the franchisor and Northstar ITCA Management, LLC ("Northstar"), the Debtor's affiliate.  (App. Br. 5.)  The Franchise Agreement requires that Northstar perform specific renovations to the hotel costing approximately $620,000 (the "Property Improvement Plan" or "PIP"), by November 14, 2013.  (*Id.*)  These renovations included, e.g., installing new carpet, ensuring that the facilities comply with the requirements of the Americans with Disabilities Act, and installing new wallpaper.  (*See* Bankr. Court Hr'g Tr., Mar. 7, 2013, 22:2-13, Doc. No. 105.)

On November 5, 2012, the Debtor filed a motion requesting permission from the Bankruptcy Court to use the Creditor's cash collateral for the payment of its operating expenses in order for the hotel to remain in business.  (Debtor's Mot., Doc. No. 65.)  VWI filed limited objections to the Debtor's motion on November 12 and 13, 2012.  (Doc. Nos. 70-71.) Specifically, although the Creditor did not generally object to the use of cash collateral for a

---

> (b) Notwithstanding section 327 (a) of this title, a person is not disqualified for employment under section 327 of this title by a debtor in possession solely because of such person's employment by or representation of the debtor before the commencement of the case.

11 U.S.C. § 1108 provides: "Unless the court, on request of a party in interest and after notice and a hearing, orders otherwise, the trustee may operate the debtor's business."

limited time period, it conditioned any use on, *inter alia*, the Debtor committing to funding any operating shortfalls from equity and paying any excess cash flow to VWI instead of using that cash flow to fund any project improvement plan. (Creditor's Limited Objection 2-3, Doc. No. 70.) On December 11, 2012, the Bankruptcy Court entered its First Interim Order authorizing the Debtor to use VWI's cash collateral for an interim period ending on February 15, 2013. (First Interim Order, Doc. No. 81.) This Order included certain terms and conditions, e.g.:

> (1) the Debtor is prohibited from using the cash collateral except in accordance with the budget; (2) cash collateral shall not be used to fund professional fees or expenses; (3) management fees shall not be paid from cash collateral; and (4) no cash collateral may be used to fund expenses associated with any [PIP] absent consent of VWI or further resolution of the issue by the Court.

*Id.*[4]

After entry of the First Interim Order, the Creditor again objected to the Debtor's use of cash collateral. Specifically, on January 31, 2013, VWI filed a limited objection stating that although the Bankruptcy Court previously ordered that the Debtor could not use cash collateral to fund any PIP absent VWI's consent, the Debtor has continued to insist that it be permitted to do so. (Creditor's Objections ¶¶ 13-25, Doc. No. 92.) VWI insisted that the Debtor not be permitted to use cash collateral for any improvements or for the PIP because these expenditures would constitute the use of estate assets outside of the ordinary course of business, as defined in 11 U.S.C. § 363(c)(1). (*Id.*) Chief among VWI's concerns was that the Debtor could not offer

---

[4] Cash collateral is defined in the First Interim Order as follows:

> Cash collateral as defined by Section 363(a) of the Bankruptcy Code includes post-petition proceeds, products, offspring, rents, or profits of property and the fees, charges, accounts or other payments for the use or occupancy of rooms and other public facilities in hotels, motels, or other lodging properties subject to a security interest as provided in Section 552(b) and as the term "proceeds" described in UCC Section 9-306 . . . .

(First Interim Order, Doc. No. 76.)

adequate protection to VWI, which had a lien against all post-petition hotel revenues.  (*Id.*)  Accordingly, the Creditor insisted that the Debtor seek separate approval for any PIP expenditures.  (*Id.*)

On February 7, 2013, the Court held a hearing on the Debtor's cash collateral motion and extended the First Interim Order until March 15, 2013.  (Doc. No. 101.)  Subsequently, VWI entered a Supplemental Objection to the Debtor's Motion.  (Doc. No. 103.)

Then, on March 7, 2013, the Bankruptcy Court held a hearing on the Debtor's request to extend and modify the terms of the original cash collateral Order.  At issue was the Debtor's request to use the cash collateral in order to meet the obligations of the Franchise Agreement, i.e., to fund and thus complete the PIP in a timely manner.  The Bankruptcy Court heard testimony from Mr. Patel, and based on the record before the Bankruptcy Court, including that testimony, the Bankruptcy Court found that there was adequate protection and authorized the use of cash collateral for the PIP.  Specifically, the Bankruptcy Court found:

> The franchise agreement – and this is probably the most significant aspect of this issue – is critical to the retention of value, the enhancement of value, the maintenance of cash flow, the [ ] continuity of operations for the benefit of the debtor and all creditors, including the protection of the secured creditor in terms of the value of these premises . . . And from a layman's point of view, it doesn't take much expertise to understand that fresh carpeting and fresh wallpaper or the like is an enhancement to value, even putting aside the basic proposition that preservation of the franchise, which is a critical component here, the functioning of this operation is a retention of value and probably an enhancement of value as well . . . The key question here is adequate protection.  And I have outlined the ways in which I think the secured creditor is adequately protected here.

(Hr'g Tr. 50:18-24; 51:15-21; 53:2-4.)

In the Bankruptcy Court's Second Interim Order authorizing the use of cash collateral and setting hearing on further use of cash collateral, which was issued on April 18, 2013, (Doc. No. 118), the Bankruptcy Court found that the Debtor did not have sufficient unencumbered cash

or other assets with which to continue to operate its business in Chapter 11.[5] In authorizing the use of cash collateral for the PIP, the Bankruptcy Court also provided VWI with additional adequate protections.[6] (*Id.*) This appeal followed.

---

[5] The Bankruptcy Court stated:

> E.  The Debtor does not have sufficient unencumbered cash or other assets with which to continue to operate its business in Chapter 11.  The Debtor requires immediate authority to use Cash Collateral . . . in order to continue its business operations without interruption toward the objective of formulating an effective plan of reorganization.  Debtor's use of Cash Collateral . . . is necessary to avoid immediate and irreparable harm to the estate pending a final hearing . . . .
>
> F.  Debtor is authorized to use the Cash Collateral to meet their ordinary cash needs . . . [and] may be utilized for the purposes of funding the Property Improvement Plan [ ] of the hotel franchisor . . . .

[6] These additional adequate protections included:

> a. **Replacement Liens.** To the extent that VWI's liens and security interest do not continue post-petition by operation of section 552 (b)(2) of the bankruptcy code, VWI is granted replacement perfected security interests under Section 361(2) of the Bankruptcy Code to the extent the Cash Collateral of VWI is used by the Debtor, to the extent of, and with the same priority in the Debtor's post-petition collateral, and proceeds thereof, that VWI held in the Debtor's pre-petition collateral, subject to fees pursuant to 28 U.S.C. § 1930(a)(6).
>
> b. **Statutory Rights Under Section 507(b)**.  To the extent the adequate protection provided for hereby proves insufficient to protect VWI's interests in and to the Cash Collateral, VWI shall have a super-priority administrative expense claim, pursuant to Section 507(b) of the Bankruptcy Code, senior to any and all claims against the Debtor under Section 507(a) of the Bankruptcy Code, whether in this proceeding or in any superseding proceeding, excluding U.S. Trustee fees, pursuant to 28 U.S.C. § 1930(a)(6) and excluding any Chapter 5 avoidance claims.
>
> c. **Deemed Perfected.** The replacement liens and security interests granted herein are automatically deemed perfected upon entry of this Order without the necessity of VWI taking possession, filing financing statements, mortgages or other documents. Although not required, upon request by VWI, Debtor shall execute and deliver to VWI any and all UCC Financing Statements, UCC Continuation Statements, Certificates of Title or other instruments or documents considered by VWI to be necessary in order to perfect the security interests and liens in the Debtor's post-petition collateral and proceeds granted by this Order, and VWI is authorized to receive, file and record the foregoing at VWI's own expense, which actions shall not be deemed a violation of the automatic stay.
>
> d. **Periodic Accountings.** Within fourteen (14) days of the entry of this Order, the Debtor shall provide monthly periodic accountings to the Secured Creditor setting forth the cash receipts and disbursements made by the Debtor under this Order in the form of the Debtor's monthly United States Trustee operating reports. Upon appointment of a Creditor's Committee, the Debtor shall submit a copy of the monthly U.S. Trustee operating reports to counsel to said Committee if counsel has been appointed, and until counsel is retained, to the Chairman of said Committee.  In addition, Debtor shall provide VWI with the following documentation: 1) daily night clerk's reports (to be provided every two weeks); 2) copy of Debtor's monthly Operating Reports as submitted to the United States Trustee's Office; including schedules of receipts and disbursements and P & L statement; 3) Monthly list of accounts payable, accounts receivable,

## II.     DISCUSSION

### A.  Standard of Review

In its appeal, the Creditor challenges the Bankruptcy Court's decision to authorize the use of cash collateral to fund the PIP based on the finding that adequate protection existed.  This Court has appellate jurisdiction over a final order of the Bankruptcy Court pursuant to 28 U.S.C. § 158(a).

Under Rule 8013 of the Federal Rules of Bankruptcy Procedure, a district court cannot set aside the factual determinations of a bankruptcy court unless they are "clearly erroneous." Fed. R. Bankr. P. 8013; *In re Cellnet Data Systems, Inc.*, 327 F.3d 242, 244 (3d Cir. 2003).  The Third Circuit has held that a "bankruptcy court's conclusion that [a party] had adequate protection [is] a factual finding which [is] reviewed using the deferential clearly erroneous standard."  *In re Swedeland Dev. Group*, 16 F.3d 552, 558 (3d Cir.1994).  A factual finding is clearly erroneous only where "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

---

and PPE; 4) Monthly Quality Assurance Reports, as provided to Debtor by the Franchisor; 5) Copies of any accident and guest issue reports submitted to the Franchisor as required by the Franchise Agreements; 6) Monthly STAR data reports, including comp set analysis; 7) 2013 proposed budget; 8) Marketing Plan for 2013, including Sales Action Plans; 9) payroll reports; 10) monthly variance from budget; and 11) monthly group Pace reports, if any.  The failure to strictly, fully and fairly comply with these deadlines shall constitute a default under this Cash Collateral Order and the authority provided to the Debtor to use the Cash Collateral shall be subject to being declared void ab initio by the Court. The unauthorized use of Cash Collateral by the Debtor while the Debtor is out of compliance with this section of this Order may, in the Court's discretion, constitute cause for the dismissal or conversion of the Debtor's case or the appointment of a Chapter 11 trustee. The above doe[s] not constitute any agreement by the Debtor to any such relief requested by VWI, and Debtor reserves all rights in this regard.

(Second Interim Order, Doc. No. 118.)

### B.  Adequate Protection

The Bankruptcy Code permits a Debtor-in-Possession to use cash collateral only where the creditor consents or the court finds that there is "adequate protection" of the secured creditor's interest in the cash collateral.  11 U.S.C. § 363(c)(2)-(3).  Although "adequate protection" is not explicitly defined, "section 361 of the Bankruptcy Code states that it may be provided by:  (1) periodic cash payment; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property . . . . [D]etermination of whether there is adequate protection is made on a case by case basis." *Swedeland*, 16 F.3d at 564.

On appeal, the Creditor argues that the evidence before the Bankruptcy Court was insufficient to support a finding of adequate protection and that the additional protections afforded by the Bankruptcy Court by way of, e.g., replacement liens and financial reporting, *see* note 6 *supra*, are insufficient.

First, VWI argues that there was insufficient evidence in the record for the "Bankruptcy Court [to have] concluded that the renovation of the hotel provided adequate protection to VWI because the value of the hotel would be 'enhanced.'"  (App. Br. 15-16.)  However, during the March 7, 2013, hearing the Bankruptcy Court identified several facts on which it based its conclusions as to enhanced value and adequate protection.

For example, Mr. Patel testified that completion of a PIP enhances the value of a hotel property as well as its cash flow.  He also testified that the value of a hotel associated with a quality franchise would be significantly higher than the value of an independent hotel that does not have the same affiliation.  He attributed this to the fact that when a hotel is associated with a quality franchise:

> you're getting the brand recognition, you're getting the loyalty programs, you're getting the internet connections and the reservation system that's tied in . . . so with Holiday Inn's website . . . it just gives more access to more customer base, and more convenient in booking and communicating with the hotel through the technological and the infrastructure that the franchise system provides.

(Hr'g Tr. 30:14-24.) Based on this testimony, the Bankruptcy Court found that the retention of the Franchise Agreement was "critical to the retention of value, the enhancement of value, the maintenance of cash flow, the [ ] continuity of operations for the benefit of the debtor and all creditors, including the protection of the secured creditor in terms of the value of these premises" and thus VWI would be adequate protected due to the retention of the Franchise Agreement by virtue of the PIP and its attendant value. (*Id.* 50:18-24; 53:2-4.)

The Court believes that the Bankruptcy Court's finding was not clearly erroneous in light of testimony presented. Indeed, if the maintenance of a franchise is critical to the Debtor's continued success and economic viability, putting the Debtor in a position where it was *unable* to fund the PIP and meet its obligations under the Franchise Agreement, might result in a decrease in the hotel's value.[7] Indeed, a number of bankruptcy courts have looked favorably upon the use

---

[7] The Creditor relies on *In re Swedeland Development Group, Inc.* in support of its argument that there must be a concrete showing as to the exact value of "enhancement" on a dollar for dollar basis. 16 F.3d 552 (3d Cir. 1994). This Court finds, however, that *Swedeland* is distinguishable. In *Swedeland*, a Chapter 11 case, Swedeland was developing a golf course and residential project. *Id.* at 556. Pre-petition, Carteret Federal Savings Bank supplied Swedeland's acquisition and development financing and took a first mortgage on the reality. Post-petition, the bankruptcy court *subordinated* Carteret's *first position lien* to that of a *superpriority lien* granted to a new bank—First Fidelity Bank—pursuant to 11 U.S.C. § 364(d). This represented a diminution of Carteret's interest as a result of the superpriority lien given to First Fidelity. Here, however, VMI's interests are not being supplanted by another creditor; rather, the cash collateral which has been used to fund the Debtor's business operations are now also being used to fund the PIP. *Cf. In re Dynaco Corp.*, 162 B.R. 389, 397 (Bankr. D.N.H. 1993) (stating that "[c]ash collateral usage in the early stages of a chapter 11 reorganization proceeding is simply unique in that if the debtor were to be required to provide dollar-for-dollar new money replacement to cover a temporary decline in the cash collateral level few debtors coming into the bankruptcy court for reorganization would be able to comply.").

Additionally, in *Swedeland*, the record established that the debtor's sales projections for the first five months of its Chapter 11 proceedings were not met and cash flow projections were also deficient. 16 F.3d at 566. But in this matter, the performance of the Debtor's hotel has exceeded projections in the recent months. (*See* Hr'g Tr. 50:5-6.) Illustratively, Mr. Patel testified that in the month of February, "our revenues were above last year by approximately

of cash collateral where its use served to enhance the secured creditor's position through the generation of additional value. *See In re Dynaco Corp.*, 162 B.R. 389, 395 (Bankr. D.N.H. 1993) ("the concept [of adequate protection] consists of stability in collateral value rather than any particular level of value") (citation omitted); *In re T.H.B. Corp.*, 85 B.R. 192, 193-95 (Bankr. D. Mass. 1988) (stating that part of the Bank's adequate protection was the "fact that the proceeds of accounts receivables are being used by the Debtor to generate new inventory and accounts", and that "[t]he use of the Bank's cash collateral . . . is an element of the Bank's adequate protection"); *Bankers Life Ins. Co. v. Alyucan Interstate Corp.,* 12 B.R. 803 (Bankr. D. Utah 1981) (holding similarly).[8]

Second, VWI also raises concerns about the Debtor's ability to complete the PIP by the deadline set forth in the Franchise Agreement, which could result in termination of the franchise. (App. Br. at 6.)  If this happens and the Debtor needs to obtain a new franchise, VMI argues that some of the PIP expenditures could be wasted. (*Id.*)  The Creditor's basic point is that because of these issues, the potential for enhanced value is illusory at best.  The Court finds, however, that there was sufficient testimony before the Bankruptcy Court to support a contrary conclusion such that the Bankruptcy Court's finding of adequate protection based on the record before it was not clearly erroneous.

---

$40,000.  To date . . . for this year our revenues, as compared to the prior year when the receiver was managing [the hotel], [are] up by about $90,000.  [Further,] occupancy . . . is up by 25 percent," and "average daily rate is up by $5." (*Id.* 18:15-25.)  Indeed, the Debtor has not only met its financial projections for the month of February 2013 that had previously been submitted to the Court, but exceeded the projections by approximately ten to twelve percent. (*Id.* 19:1-8.)

[8] *See also Fed. Nat. Mort. v. Dacon Bolingbrook Assoc.,* 153 B.R. 204, 214 (N.D. Ill. 1993) (security interest adequately protected to extent debtor reinvested rents in operation and maintenance of the property); *In re Stein,* 19 B.R. 458, 460 (Bankr. E.D. Pa. 1982) (cash collateral usage allowed where such use is essential "in order to meet operational costs" and where the "secured position can only be enhanced by the continued [business] operation . . . .").

10

As an initial matter, VWI argues that "[a] small portion of the PIP includes expenditures for franchise brand specific signs, towels, and other items which include the Holiday Inn logo." (*Id.*)  Because of this, "if the franchise is terminated, th[o]se items bearing the Holiday Inn trademark will not be able to be used for the operation of the hotel and will have to be replaced." (*Id.*)  However, during the hearing, Mr. Patel testified that prior to the temporary receiver's appointment in 2011, a number of brand specific items already had to be implemented in order for the Debtor to get the franchise.  Thus, a number of the brand-specific items that were required, were already in place.  Additionally, in moving forward with the PIP, Mr. Patel testified that the Debtor will be dealing with more non-brand specific items like carpeting and wallpaper and the purchase and installation of brand specific items will be less than five percent. (Hr'g Tr. 25:8-26:8.)  Finally, he testified that "approximately 95 percent of the work done on the PIP could be . . . transferred if the hotel was not in the Holiday Inn system and went to another system."  (*Id.* 26:9-13.)

As for VWI's concerns that the PIP will not be completed on time, Mr. Patel testified that although there had been some timing issues in the past, Holiday Inn has been flexible in allowing the Debtor, and previously the receiver, to work on finishing the PIP while continuing to operate the hotel as a Holiday Inn franchise.  (*Id.* 40:7-41:4.)

Finally, the Creditor takes issue with the fact that the Debtor still needs money from outside sources to complete the PIP.  Even though the Debtor plans to use capital contributions from friends and family of the Debtor's principals, the Creditor notes that the Debtor does not have any written commitments for these capital contributions. (App. Br. at 7.)  However, Mr. Patel testified that the Debtor had already received a capital infusion in terms of franchise requirements, the injections of capital were going to be there each month as required, and

11

importantly, the commitments for future infusions were by way of capital investment, and not by loan.  (Hr'g Tr. 20:22-21:3; 34:5-35:10.)

The Bankruptcy Court found that these infusions would serve to improve the property, but also stated that its findings would be without prejudice to future showings.  (*Id.* 50:24-51:3.)  In the Bankruptcy Court's Order, it ordered the Debtor's principals to "provide on a monthly basis, sufficient funding as required, together with excess revenue generated by the Debtor's business operations, to fund that portion of the PIP scheduled to be performed during that calendar month."  (Second Interim Order ¶ 2.)  It further ordered that the Debtor must "notify counsel for VWI by electronic mail within one business day upon the Debtor's receipt of the Injection of Capital and provide to counsel for VWI evidence that the Injection of Capital has been deposited into the Debtor's debtor-in-possession bank accounts."  (*Id.*)  Finally, it ordered that if the Debtor did not receive the "Injection of Capital . . . the Debtor shall *not* be permitted to use any of the Cash Collateral for the PIP and VWI shall have the right to seek immediate redress or relief from the Court."  (*Id.* (emphasis added).)

Based on the record before the Court, and the importance that it "give due regard to the bankruptcy court's opportunity to judge the credibility of the witnesses," *In re Englander*, 95 F.3d 1028, 1030 (11th Cir. 1996), the Court is convinced that the Bankruptcy Court based its finding of adequate protection on sufficient evidence and that there was no clear error.  Accordingly, because the Court finds no reason to disrupt the factual findings of the Bankruptcy Court, it will affirm the Bankruptcy Court's Order.[9]

---

[9] VWI also contends that the additional adequate protection afforded by the Bankruptcy Court in the form of, *inter alia*, replacement liens and periodic financial reporting, *see* note 6 *supra*, does not reach the levels of protection which were found to be *insufficient* in *Swedeland*.  However, as discussed in note 3 *supra*, *Swedeland* is distinguishable.  Further, because the Court concludes that the Bankruptcy Court's factual finding as to adequate

### III. CONCLUSION

In light of the foregoing reasons, the Bankruptcy Court's Order is **AFFIRMED**. An appropriate order shall issue today.


Date:  3/31/2014                                         s/ Robert B. Kugler
                                                         ROBERT B. KUGLER
                                                         United States District Judge

---

protection—based on the increase in value to the hotel due to the implementation of the PIP—was not clearly erroneous, it need not evaluate the other protections afforded by the Bankruptcy Court's Order.  The Court will note, however, that the Bankruptcy Court took great pains to provide mechanisms by which VWI could seek relief from the Bankruptcy Court should the Debtor fail to abide by the Court's Second Interim Order, e.g., it provided that the Debtor's use of the cash collateral must immediately cease if it does not receive the promised injections of capital.  The Court is reassured that should future concerns arise, VWI will have ample avenues of redress in the Bankruptcy Court.